In the Matter of CONCRETE
PRODUCTS, INC.,
Debtor.

Bankruptcy No. 88–20540.

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

July 2, 1996.

William S. Orange, III, Brunswick, GA, for debtor.

E. Laney Russell, Jacksonville, FL, for Harold Zell.

William E. Dillard, III, Savannah, GA, for B.E. Bledsoe.

## ORDER ON DEBTOR'S MOTION TO EMPLOY INSIDER HAROLD ZELL NUNC PRO TUNC AND MOTION TO COMPENSATE AND REIMBURSE HAROLD ZELL

LAMAR W. DAVIS, Jr., Chief Judge.

Harold Zell, chief executive officer and president of the board of directors of Concrete Products Inc. (hereinafter "Debtor"), filed the above Motion on April 8, 1996, and this Court scheduled a hearing in Brunswick, Georgia, on May 2, 1996. In the application, Zell seeks compensation totalling approximately $58,200.00 for services rendered to the Debtor between the years 1990 and 1995.

Zell also seeks reimbursement for approximately $21,760.70 in actual expenses. This matter is a core proceeding under 28 U.S.C. Section 157(b)(2)(A). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

Debtor filed for Chapter 11 relief on October 3, 1988. At that time, the chief executive officer was B.E. Bledsoe; Harold Zell held no position with the Debtor corporation. However, in November 1988 the Debtor's shareholders elected a new board of directors which for the first time included Harold Zell. On January 10, 1989, the board convened and appointed Zell president and chief executive officer. At the time of his appointment the board established no salary for him, nor was there any agreement as to how he would be compensated. Because of litigation between the then president, B.E. Bledsoe, and the board, this Court temporarily enjoined the termination of Bledsoe. For a brief time, both Zell and Bledsoe acted as corporate officers until I entered an order for the appointment of a Chapter 11 trustee who served from May 1989 through November of 1990.

By Order of November 2, 1990, this Court excused the Chapter 11 trustee from further service and included the following language within the Order:

The Board now expresses a desire to reassume management of the company and attempt to liquidate it under the auspices of a Chapter 11 liquidation plan or possibly thereafter a Chapter 7 liquidation. The continuing expense that the estate will incur by the services of a Trustee as opposed to the services of its Board of Directors in an orderly Chapter 11 liquidation is no longer necessary. I conclude, therefore, that while the services of the Trustee have been of immense value of the Court, to the Debtor, and to the creditors of the estate, the essential purpose for the services of a Chapter 11 Trustee in this case no longer

exists. Accordingly, the Trustee is excused from any further responsibility in this Chapter 11 case, with profound thanks from the Court for his services.

All matters of corporate governance are restored to the Board of Directors of Concrete Products, Inc., effective upon the date this Order becomes final. By separate order, the preliminary injunction issued in the related adversary proceeding will be vacated inasmuch as there are no remaining prospects for reorganization and the underlying reasons for entry of that preliminary injunction no longer exist.

Testimony at trial revealed that upon issuance of the Order restoring "corporate governance" to the board of directors, the board again elected Zell to serve as president and chief executive officer. As the CEO of a liquidating Chapter 11, Zell undertook to organize the liquidation of the business, to inventory and sell its assets, to reconcile its books and records, to provide for cleanup of hazardous waste on the property and to deal with products liability suits. *See Memorandum in Support of Harold Zell's Application,* Ex. 'A' (Minutes of the Bd. of Dir. on Jan. 7, 1991), Ex. 'B' (Minutes of the Shareholders on Jan. 7, 1991), Ex. 'C' (Resolution of Shareholders to Orderly Liquidate on Jan. 7, 1991). He has spent considerable time since 1990 in pursuing these matters. There is no doubt that his services have benefited the estate[1] and have been of assistance to the attorneys representing the Debtor in bringing this case to the point where it is in a position to be concluded. In support of his application for compensation for these services, Zell submitted an extensive narrative of the activities he undertook during the five and one-half-year period from 1990 to the present. However, Zell maintained no time records during any of the years for which he now seeks compensation and only prepared his narrative explanation approximately three weeks before the hearing from memory and by means of reviewing his files from the company. For each calendar year he requests compensation in a lump sum as follows:

| 1990 | $ 6,000.00 |
|------|-----------|
| 1991 | $24,000.00 |
| 1992 | $14,400.00 |
| 1993 | $ 7,200.00 |
| 1994 | $ 4,200.00 |
| 1995 | $ 2,400.00 |
| Total | $58,200.00 |

In addition, he seeks the reimbursement for expenses of $21,760.70 which he has advanced or incurred—comprised of office rental in the amount of $2,350.00, copy charges $16,636.80, computer usage $1,175.00, postage $191.00, supplies $120.00, travel $394.90, and telephone expense $893.00. With respect to these items, the testimony revealed that Zell is not personally out-of-pocket for any of the expense items; instead, at least since March 1992, "I-95 Mall, Inc.," a closely held corporation in which Zell holds a majority interest, has maintained the records and actually incurred the other expenses of the Debtor although Zell asserts that it is he who ultimately remains liable.

First and foremost, it is undisputed that Mr. Zell never obtained the express approval of this Court to be employed by the Debtor during the Chapter 11 liquidation although Zell concedes that he understood the Code requirements to seek court appointment of professionals. Indeed, the record reveals that following his reassumption of control of the business the Debtor timely filed applications for appointment of certain professionals. *See Application for Leave to Retain Professional Persons—Attorneys,* Doc. No. 350, Nov. 26, 1990; *Application for Leave to Retain Professional Persons—Accountants,* Doc. No. 351, Nov. 26, 1990.

It is also undisputed that Zell never listed his salary nor the accrual of any expenses

---

1. The Registry of this Court now has approximately $364,000.00 on deposit. Of that amount, over $303,000.00 was remitted by Mr. Walker, the former Trustee, and the balance represents net interest earned. The latest Disclosure Statement reflects an estate of $482,927.00 in cash and one receivable of $14,251.32 as of December 31, 1995. Therefore, during Mr. Zell's tenure approximately $133,000.00 has been realized, not $482,000.00 as paragraph 7(f) of Zell's affidavit implies.

related to his services on the periodic financial reports submitted to the Office of the United States Trustee. Throughout the time of his management, Zell, on behalf of the Debtor, has caused to be filed with the Office of the United States Trustee, all of the monthly financial reports required of a Chapter 11 Debtor. Because Zell has not paid himself any salary nor reimbursed himself for any expenses, there was no requirement for and, therefore, no disclosure of any salary or expense payment on these reports. Zell, however, contends that compensation and expenses have been accruing since 1990, yet nowhere in these reports has he disclosed the accrual of this obligation as an account payable.

At trial, Mr. Zell testified that he always expected to be paid for his services and that the language of disclosure statements filed on his behalf in 1990 and 1992 reveal that he expected compensation.[2] However, this Court never approved either disclosure statement. Although the 1990 statement states that salaries will be set by the Board, it is uncontradicted that the Board never voted Zell a salary. The 1990 statement is, therefore, unpersuasive. Moreover, the 1992 disclosure statement, to the extent it is relevant, is contradictory to his testimony. In particular, the 1992 disclosure statement reveals that Zell intended to manage the debtor's liquidation, but there is no mention of salary. *See Disclosure Statement on Plan of Liquidation Proposed by Concrete Products, Inc.,* Doc. No. 536, para. 7, 11, Sept. 9, 1992. More notably, it fails to reveal any claims of insiders such as Zell.[3] In fact, paragraph six of the disclosure statement, which is entitled "Transactions with Insiders," states "there are no unresolved matters involving insider transactions" that are known to Zell. Considering the compensation that Zell now requests for the years 1990–1992, at the time of the 1992 disclosure statement the Debtor allegedly owed Zell at least $37,000.00.[4] Finally, the 1992 disclosure statement affirmatively asserts that there are no payments or promises of the type specified in Section 1129(a)(4),[5] "which have not been disclosed to the court." In light of his current testimony, that statement is misleading at best. In summary, the 1992 disclosure statement supports an inference that Mr. Zell was working without compensation.

Debtor's counsel, William S. Orange, III, testified that he only became aware that Mr. Zell would seek compensation during the winter of 1995 when they had a chance encounter at a local grocery store. Orange testified that he thought Zell had been receiving compensation from the debtor-in-possession account even though the monthly reports filed with the Office of the United States Trustee clearly reveal no such expenditure. Nevertheless, he supports Zell's application. He testified that Zell's actions on behalf of the Debtor were beneficial, that Zell was acting, as he put it, "in the role of a quasi trustee," and that in the absence of Zell being so involved, the Debtor would have incurred expenses for the hiring of some other professional to perform similar duties.

As previously stated, Mr. Zell testified that the board of directors neither authorized an

---

**2.** *See Disclosure Statement Proposed by Harold Zell,* Doc. No.273, p. 12, Sept. 4, 1990 ("The Debtor's liquidation will be made by its Board of Directors. Supervision will be by Proponent, Harold Zell, assisted by Jack Torbett. Salaries for the personnel who will supervise the liquidation process will be set by Debtor's current Board of Directors"); *Disclosure Statement on Plan of Liquidation Proposed by Concrete Products, Inc.* Doc. No. 536, p. 4, Sept. 9, 1992 ("The Debtor's post-confirmation activities, directed at carrying out the provisions of its liquidation plan, will be managed by its president and board chairman, Harold Zell").

**3.** It is without question that Zell has been an insider since he assumed his position on the board of directors in 1989. In pertinent part, 11 U.S.C. § 101(31)(B) provides that if the debtor is a corporation an "insider" includes a director, officer, or person in control of the debtor.

**4.** Zell has requested compensation of $6,000.00 for 1990, $24,000.00 for 1991, and $14.400.00 for 1992 of which over half would have accrued at the time of tile Disclosure Statement.

**5.** In pertinent part, 11 U.S.C. § 1129(a)(4) relates to "[a]ny payment ... to be made by the ... debtor ... for services or for costs and expenses ... in connection with the case...."

employment contract for him nor set any salary. Zell also admitted that, at the time the board employed him, he had no idea how he would be paid. Further, Zell conceded that the board never expressly authorized him to do business on behalf of Concrete Products with any of his other closely held corporations, nor specifically authorized any of the expenditures for which compensation is now sought. Finally, he acknowledged that for the five-month period after he was appointed president in January 1989 until the appointment of the Chapter 11 trustee in May 1990 he received no salary. In fact, as far as this Court is aware, Harold Zell has never received any compensation from Concrete Products, Inc.

Although the Motion does not identify the statutory authority for the employment of Mr. Zell, through the briefs filed as well as the arguments articulated by counsel at hearing, Debtor seeks authority to compensate Zell under three alternative theories. First, Debtor contends that by virtue of certain language in the Order of November 2, 1990, this Court in fact appointed Zell to serve in a professional capacity for which services he should now be compensated. Second, Debtor asserts that even at this stage of the liquidation, Section 327 permits the Debtor to compensate Zell. Finally, Debtor claims that pursuant to Section 503 payment for Zell's services during the liquidation of this company are payable as an actual and necessary expense of preserving the estate.

### CONCLUSIONS OF LAW

 Based on the above factual findings and after reviewing the applicable authorities I conclude that Mr. Zell's application must be denied. Zell proffers three theories for an award of an administrative expense claim: (1) this Court has already employed Zell; (2) pursuant to Section 327(a) Zell's application should be approved *nunc pro tunc* and allowed under Section 503(b)(2); and (3) regardless of prior approval Section 503(b)(1) of the Code authorizes compensation for Zell since he performed services that were actual and necessary to the preservation of the estate. The result of either alternative is to allow Harold Zell a priority claim that permits him to receive compensation ahead of certain priority and all unsecured creditors. In assessing his application the beginning point is that priority claims are subject to careful scrutiny. *See Matter of Jartran Inc.,* 732 F.2d 584, 586 (7th Cir.1984); *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir. 1976). The claim of priority should be founded on a strict statutory basis; if the claim does not derive from the language of Section 503, it must fail. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad,* 658 F.2d 1149, 1163 (7th Cir.1981) (general rule is equality of distribution; deviation must appear in the statute). This requirement avoids incorporating priorities unintended by Congress and diluting the claims of other valid priority creditors. To that end, close supervision of administrative expenses is mandated in order to prevent depletion of debtor's estate. *See In re Colortex Industries, Inc.,* 19 F.3d 1371, 1377 (11th Cir.1994) ("priorities should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors"); *Otte v. United States,* 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974); *Brown v. Gerdes,* 321 U.S. 178, 64 S.Ct. 487, 88 L.Ed. 659 (1944); *Leiman v. Guttman,* 336 U.S. 1, 69 S.Ct. 371, 93 L.Ed. 453 (1949).

The scrutiny becomes even greater when as in the present case the claimant is an insider. *See Pepper v. Litton,* 308 U.S. 295, 308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939); *see also In re Club Development & Management Corp.,* 27 B.R. 610 (B.A.P. 9th Cir. 1982)("... the duty of close scrutiny by the court is particularly acute where ... there is no independent trustee to help insure that claims by the fiduciaries meet the test enunciated in *Pepper* ..."). Finally, it is applicant's burden to prove his right to compensation. *See In re Beverly Mfg. Corp.,* 841 F.2d 365 (11th Cir.1988); *In re Poseidon Pools of America, Inc.,* 180 B.R. 718 (Bankr.E.D.N.Y. 1995). In light of the above, Zell's three contentions will be examined.

### I. Mr. Zell was not previously employed by this Court's Order.

 The first contention to be addressed is that by virtue of certain language

within this Court's November 2, 1990 Order, Mr. Zell was in fact approved for employment. This contention is incorrect. Certainly, the language of that Order makes no express reference to Zell, the approval of his employment, or any other matter which would sustain a finding that Zell already has been granted a right to compensation. To the contrary, the Order recites, as one of the reasons for the restoration of corporate governance to the board of directors and of this Court's decision to excuse the Trustee, that "the continuing expense that the estate will incur by the services of a trustee as opposed to the services of its board of directors in an orderly Chapter 11 liquidation is no longer necessary." If anything, this language reflects Debtor's contention throughout the case that the appointment of a Chapter willing, and able to run the corporation, with the expressed or implied suggestion that that effort would be made at reduced, or no expense, to creditors. While it would be inappropriate to deny Zell's application on this ground alone, certainly there is nothing in the language of the Order which constitutes an express decision by the Court for him to be employed and compensated. The mere clarification that once a trustee's services are terminated, the authority to conduct a corporation's affairs is vested in its shareholders, directors and officers falls far short of an order to employ and pay Zell. That revesting of corporate governance carries with it a fiduciary obligation to creditors under both Georgia law and the Bankruptcy Code. *See* O.C.G.A. §§ 14–2–830, 14–2–842; *Super Valu Stores, Inc. v. First National Bank of Columbus, Georgia,* 463 F.Supp. 1183 (M.D.Ga. 1979); *see also Hickman v. Hyzer,* 261 Ga. 38, 40, 401 S.E.2d 738, 740 (1991) ("[w]hen a corporation becomes insolvent, its directors are 'bound to manage the remaining assets for the benefits of its creditors' "); While fulfillment of that duty might not have required the performance of every action undertaken by Zell, the fact that directors have such a duty, independent of any right to compensation, is consistent with the notion that merely placing the board in control included no authorization to compensate. The

Bankruptcy Code also establishes numerous duties of a debtor-in-possession and expressly excludes any separate entitlement to compensation under Section 330. *See* 11 U.S.C. §§ 1107(a), 1106(a)(1) and (5), and 704(2) and (7). *Accord In re William A. Smith Construction Company Inc.,* 92 B.R. 757, 759 (Bankr.N.D.Ohio 1988). Mr. Zell is not entitled to compensation under this theory of the case.

## II. Mr. Zell's employment by the board cannot be retroactively approved under Section 327.

Mr. Zell's second contention is that because he actually was employed by the board of directors of the debtor corporation, this Court now should approve his employment *nunc pro tunc,* effectively granting Zell compensation for his services and reimbursement of his out-of-pocket expenses. This contention likewise is not well founded. With regard to employment of professional persons, 11 U.S.C. Section 327 provides in relevant part as follows:

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, *or other professional persons,* that do not hold or represent an interest adverse to the estate, and *that are disinterested persons,* to represent or assist the trustee in carrying out the trustee's duties under this title.

(b) If the trustee is authorized to operate the business of the debtor under section 721, 1202, or 1108 of this title, and if the debtor has regularly employed attorneys, accountants, or other professional persons on salary, the trustee may retain or replace such professional persons *if necessary in the operation of such business.*

11 U.S.C. § 327(a) and (b) (emphasis added). While there is authority for the proposition that a professional may not be compensated for services rendered prior to the date of the professional's employment, *see Lavender v. Wood Law Firm,* 785 F.2d 247 (8th Cir.1986),

there is also considerable authority for the proposition that retroactive employment is permissible. *See Matter of Triangle Chemicals, Inc.*, 697 F.2d 1280 (5th Cir.1983); *Matter of Laurent Watch Co., Inc.*, 539 F.2d 1231 (9th Cir.1976); *In re TJN, Inc.*, 194 B.R. 396 (Bankr.D.S.C.1996) (recognizing a split in the circuits and permitting *nunc pro tunc* employment); *see also* Collier on Bankruptcy ¶ 327.02, p. 327–12, n. 4 (15th Edition) (noting that two circuits, the Second and the Eighth, adhere to a *per se* rule that an unapproved attorney may not recover fees). This Court has consistently followed the less rigid line of cases, subject to the requirement that the professional who seeks such employment must show (1) that the professional would have been qualified for employment at the onset, and throughout the period of time for which the services are to be compensated, and (2) that the applicant's failure to obtain prior approval at an earlier time is excusable. *See e.g., Matter of T.P.I. International Airways, Inc.*, Ch. 11 Case No. 91–20162, slip op. at 3–5 (Bankr.S.D.Ga., June 22, 1995) (Davis J.): *Matter of A. Bayne and Billie V. Morgan*, Ch. 11 Case No. 89–40074, slip op. at 4–6 (Bankr.S.D.Ga., Aug. 17, 1989) (Davis, J.); *In re Donald Jarvis, Joyce Jarvis*, 53 F.3d 416 (1st Cir.1995); *In re Singson*, 41 F.3d 316, 319–20 (7th Cir.1994); *In re Land*, 943 F.2d 1265, 1267–68 (10th Cir.1991); *In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105 (3d Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *In re THC Fin. Corp.*, 837 F.2d 389, 392 (9th Cir.1988); *In re Triangle Chemicals, Inc.*, 697 F.2d 1280, 1289 (5th Cir.1983); *In re Berman*, 167 B.R. 323 (Bankr.D.Mass.1994). The inquiry requires an applicant to demonstrate both the professional person's suitability for appointment and the existence of *excusable neglect* sufficient to justify the failure to file a timely application. *Singson*, 41 F.3d at 319–20. The Supreme Court suggests that when a bankruptcy court is faced with the task of determining the presence of excusable neglect the analysis is twofold.

First, is there neglect, whether actual negligence or a mere omission to act? *See Pioneer Inv. Services v. Brunswick Associates*, 507 U.S. 380, 392–94, 113 S.Ct. 1489, 1497, 123 L.Ed.2d 74 (1993) (holding that for purposes of Rule 9006(b) the Code does not require a showing of extraordinary circumstances). Second, is it excusable? To answer this question a court necessarily considers all of the circumstances surrounding the parties' omission or negligence, including,

> . . . the danger of prejudice to the debtor, the length of the delay and the potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 394–95, 113 S.Ct. at 1498. In this case, Mr. Zell can neither demonstrate that the Court would have approved his employment upon a timely application nor prove excusable neglect. First, Zell has not qualified for employment under Section 327(a) as an "other professional person" because he is not "disinterested." To be disinterested, an individual must meet the requirements of 11 U.S.C. Section 101(14) which requires that a person show that he or she is not, *inter alia,* an insider. Specifically, Section 101(31)(b) defines an insider as including a director or officer of the debtor. The record is clear that Zell was a director of the debtor, an officer of the debtor, and a relative of " . . . a director, officer, or person in control of the debtor."[6] Accordingly, because at all relevant times Zell was an insider of this debtor and, therefore, not disinterested, he would not have been appointed by this Court upon a timely application. Zell's failure to demonstrate how this Court could have appointed him initially bars his retroactive appointment *nunc pro tunc*. Second, Zell has not established a single mitigating fact which might begin to explain why he has waited nearly six years before submitting an application for employment. As already noted, Zell was very familiar with the requirements for em-

---

6. Zell is the son of Carley Zell, a major, if not the majority, shareholder of the debtor corporation.

ployment of professionals.[7] The delay in seeking appointment is not excusable and as a result, he cannot be employed under 11 U.S.C. Section 327(a).

■ In light of his disqualification Mr. Zell cannot be compensated under Section 327(a). The clear weight of authority is that a professional who renders services for a period of time in which the professional is not qualified may not be compensated. *See, e.g., United States Trustee v. Price Waterhouse,* 19 F.3d 138, 141 (3rd Cir.1994); *In re Weibel, Inc.,* 176 B.R. 209, 212 (9th Cir. BAP 1994) ("Section 330 will allow compensation ... only if court approval is first obtained pursuant to 327"); 11 U.S.C. § 328(c).

■ 11 U.S.C. Section 327(b) provides, however, that a trustee, which in this case includes the debtor-in-possession, *see* 11 U.S.C. § 1107, may, without a showing of disinterestedness, retain or replace certain professionals, but only (1) if the trustee [debtor-in-possession] is authorized to operate the business; (2) if the debtor has regularly employed such professional person on salary; (3) if such employment is necessary in the operation of the business; and (4) after court approval. *See* 11 U.S.C. § 328(a). Notwithstanding the fact that Mr. Zell was employed as president and chief executive officer of the debtor by vote of the board of directors, Zell cannot demonstrate that he is entitled to compensation under Section 327(b). First, the history of the case, the language of this Court's Order of November 2, 1990, the pending disclosure statement filed by Zell, and the corporate minutes, make clear that the authority of the board of directors was restored for the express purpose of liquidation. *See Memorandum in Support of Harold Zell's Application,* Ex. 'A' (Minutes of the Bd. of Dir. on Jan. 7, 1991), Ex. 'B' (Minutes of the Shareholders on Jan. 7, 1991), Ex. 'C' (Resolution of Shareholders to Orderly Liquidate on Jan. 7, 1991); *Disclosure Statement on Plan of Liquidation,* Doc. No. 273, Sept. 4, 1990. Accordingly, I

hold that Zell cannot be deemed to have been "retained" as a salaried employee under Section 327(b) because there was no actual intent to operate the business. Second, Debtor could not have made the requisite showing in November of 1990, and has not demonstrated now, that it was "necessary" to employ Zell in the "operation" of the debtor's business. Thus, to the extent that Debtor actually may have operated the business in a limited sense, or for a limited time, neither the debtor nor the applicant has shown that Zell's employment was "necessary" to the company's "operation," as contrasted with its liquidation. Courts clearly delineate different approaches to compensation based upon whether the debtor is liquidating or reorganizing. *See In re C.E.N., Inc.,* 86 B.R. 303 (Bankr.D.Me.1988) (advances by insiders to debtor were not in the "ordinary course of business" because debtor was not continuing in business but was preparing to sell its principal asset). Third, his "retention" under Section 327(b) was never approved as required in Section 328(a). Accordingly his employment cannot be compensated under Section 327(b).

Finally, as pointed out in the brief filed in behalf of the objecting creditor, B.E. Bledsoe, the company by-laws require that any salary be approved by the board of directors by a two-thirds vote.[8] In the absence of any corporate action by the board respecting his salary, I am unable to construe the election of Mr. Zell to act in the role of chief executive officer as automatically carrying with it any salary entitlement in the non-bankruptcy context. Nothing in the Code would override the requirement of corporate approval of his salary or otherwise enlarge his rights beyond that authorized by the board. Thus, under any plausible interpretation of Section 327, as it applies to the present case, Zell is ineligible for compensation and the Debtor's second contention, therefore, is overruled.

### III. Mr. Zell cannot be compensated under Section 503 absent employment under Section 327.

■ Finally, Mr. Zell contends that 11 U.S.C. Sections 503(a) and (b) permit the

---

7. *Supra.,* p. 1004.

8. *See Brief of B.E. Bledsoe,* p. 2, n. 2, May 15,

1996.

Debtor to compensate him for all services that were actual and necessary. In pertinent part, the pre–1994 statute provided as follows:

> (a) An entity may file a request for payment of an administrative expense.

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;

> (2) compensation and reimbursement awarded under section 330(a) of this title;

Section 503(b)(1)(A) authorizes administrative expense treatment of claims for "actual, necessary costs and expenses of preserving the estate, including, wages, salaries or commissions for services rendered." Section 503(b)(2) authorizes administrative expense priority payments to professionals who meet the requirements of Section 327 and are awarded compensation under Section 330 for actual and necessary services rendered and expense reimbursement. The first question is whether an individual who serves as a professional within the meaning of Section 327, but who is disqualified for court appointment for failure to meet the disinterestedness requirement of Section 327(a) and who, therefore, cannot be allowed an administrative claim pursuant to Section 503(b)(2), may nevertheless receive compensation under 503(b)(1) for actual and necessary services rendered to preserve the estate. While some cases authorize payments to professionals who fail to meet the requirements of Section

327, the majority, and the better reasoned cases do not. *See In re Weibel, Inc.,* 176 B.R. at 213 (holding that if compensation is denied under Section 503(b)(2), it cannot be awarded under 503(b)(1),(2)); *F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 109 (3rd Cir.1988). *Accord In re Imperial Corporation of America,* 181 B.R. 501, 506, n. 2 (Bankr.S.D.Cal.1995) (attorney barred from compensation under 327(e) may not "end run" the section by seeking compensation under 503(b)(1)); *In re Office Products of America, Inc.,* 136 B.R. 675, 688 (Bankr. W.D.Tex.1992) (denying quantum meruit compensation for unapproved professional); *In re Southern Diversified Properties, Inc.,* 110 B.R. 992, 996 (Bankr.N.D.Ga.1990) (rejecting doctrine of quantum meruit as justifiable basis for compensating professional who did not qualify under 327(a)). The rationale is clear. To apply Section 503(b)(1) to professional compensation would make the language of Sections 503(b)(2) superfluous. Congress enacted Sections 327, 330(a), and 503(b)(2) to provide the exclusive method for a debtor's retention of professionals, subject to numerous safeguards, including the requirement of disinterestedness. A court should not circumvent the limitations placed on retention of professionals by compensating a disqualified professional under Section 503(b)(1)(A). Instead, Section (b)(1)(A) is properly applicable only to authorize priority treatment of non-professional employee claims, including wages, salaries and commissions.[9]

The remaining issue is whether the services rendered by Harold Zell were professional in nature, in which case his administrative claim cannot be allowed, or whether they were in the nature of non-professional services, and therefore eligible to the extent

---

**9.** Section 503(b)(1)(A) is certainly broader than merely wage claims. Instead, it is intended to insure that parties will be willing to deal with a trustee or debtor-in-possession. Granting priority status for certain costs and expenses incurred by a trustee or debtor-in-possession to preserve the estate insures that vendors and others will continue to do business with a trustee or debtor-in-possession. *See generally* Collier on Bankruptcy ¶ 503.04, p. 327–24 et. seq. (15th Edition); *In*

*re Colortex,* 19 F.3d at 1383 (holding that pursuant to 503(b)(1) trade creditors may receive interest during Chapter 11 proceedings). As such, it has been applied to grant priority status to claims that are many and varied. In the compensation context, however, it must be limited to non-professional services of regularly employed persons, or Sections 503(b)(2), 330 and 327 are eviscerated.

they can be shown to be actual, necessary costs and expenses of preserving the estate. In light of the nature and extent of his services I find that Mr. Zell acted in the role of a professional and cannot be compensated under Section 503(b)(1)(A). The term "professional" is not limited to licensed individuals, but is defined more generally. Webster's defines a professional as "one who belongs to one of the learned professions *or* is in an occupation requiring a high level of training and proficiency." The term generally connotes one who works with little supervision or who has discretion and autonomy in the performance of his duties. Courts interpreting the scope of the term "professional" in the bankruptcy context also have distinguished between employees whose employment, although critical to the business, does not require judicial approval and those whose role is central to the administration of the estate and, therefore, requires judicial approval. *See In re EMGE Aviation Marine Products*, 1992 WL 108849 (E.D.Pa.) (president of Chapter 11 debtor which was liquidating was a professional and could not be compensated under section 503 without being appointed under section 327): *In re Florida Airlines, Inc.*, 110 B.R. 570 (M.D.Fla.1990) (president of debtor-in-possession played central role in the administration of the debtor, and thus, was "professional person" who required approval pursuant to 327(a)); *In re Boston Shipyard Corp.*, 1993 WL 370629 (D.Mass.) (holding that (1) principal shareholder and chief executive officer of chapter 11 debtor in liquidation is not entitled to compensation beyond normal salary for performing duties required of the debtor, (2) "professional" is a term which is not narrowly construed, but applies to anyone the nature of whose services meet the criteria of a professional person, (3) a professional license is not dispositive, and (4) factors include: form of compensation, time of retention (pre or post-petition), and whether employment is full time or part-time); *In re Madison Management Group Inc.*, 137 B.R. 275 (N.D.Ill. 1992) (holding that director and chief executive officer hired prepetition to liquidate assets was a professional); *In re Carolina Sales Corp.*, 45 B.R. 750 (Bankr.E.D.N.C. 1985) (holding that management consultant hired pre-petition and retained post-petition was professional requiring appointment; non-salaried employee, could not be compensated under section 327(a) or (b)); *Matter of Seatrain Lines, Inc.*, 13 B.R. 980 (Bankr. S.D.N.Y.1981) (holding that a professional is one who plays a central role in a debtor's case); *Matter of Park Terrace Townhouses v. Wilds*, 852 F.2d 1019 (7th Cir.1988) (holding that property manager held to be a professional when granted broad autonomy and unfettered discretion); *contra In re Century Investment Fund VII Ltd.*, 96 B.R. 884 (Bankr.E.D.Wis.1989) (holding that property manager not a professional when management authority had not been delegated to it). Courts reaching a different result regarding the chief executive officer of a debtor uniformly have done so in a fact situation where the chief executive officer was employed pre-petition. *See* discussion *infra* at 1012. On the facts before me, I hold that the post-petition employment of Harold Zell in a liquidating Chapter 11 case was central to the administration of the estate and, therefore, required approval under the standards applicable to professionals pursuant to Section 327.

As mentioned earlier, Mr. Zell undertook to organize the liquidation of the business, to inventory and sell its assets, to reconcile its books and records, to provide for cleanup of hazardous waste on the property and to deal with products liability suits. Zell was not a regular employee at the filing of the case or in November 1990. Rather, he was employed post-petition for the specific purpose of liquidating the Debtor. In determining that Zell acted as a professional, this Court considers of primary importance his broad autonomy and far-flung duties, his employment post-petition, and the discretion he assumed, all of which support the conclusion that Zell's employment was central to the administration of the estate. Indeed, William Orange, III, Debtor's attorney, under oath described Zell as acting as a "quasi trustee." Certainly Mr. Orange, with his

active involvement in the case, is in as good a position as anyone to determine whether an individual is a mere employee whose wages and salaries are covered under Section 503(b)(1) or a professional who must be appointed. Anyone who assumes a role which may be fairly characterized as a "quasi trustee" and who performs services of the nature outlined in Zell's application must be considered a professional. If Zell had been an existing employee of the company, worked under the direction of management, received a wage, salary or commission, remained on the payroll after the filing of the case during which time the corporation accrued an unpaid obligation for his post-petition efforts in the ordinary course of his pre-petition duties that aided in the preservation of the estate, then he certainly would be allowed compensation under Section 503(b)(1). However, these facts are not present.

The cases cited by Mr. Zell's counsel compel no different result. The language from the decision *In re Colortex*, 19 F.3d at 1383, lends some superficial support to his theory.[10] However, the Court simply held that the interest on trade debt would be afforded administrative priority for the period a Chapter 11 case is pending until the time of conversion to Chapter 7 and is clearly not controlling. *Matter of Schatz Federal Bearings Co. Inc.*, 17 B.R. 780 (Bankr.S.D.N.Y. 1982), actually supports a result contrary to Zell's position. In that case, the Court held that the fixed, prepetition compensation of the directors for attending meetings was not governed by Section 327 and would be paid under Section 503(b)(1)(A), but ongoing services beyond scope of traditional directors duties were covered by Section 327. *Id.* at 782. Further, the Court held that absent court approval such professionals can not be compensated for non-traditional efforts outside the normal scope of his employment. *Id.* at 783. In *In re Microwave Products of America, Inc.*, 100 B.R. at 382, the Court merely approved an administrative expense claim for debtor's president for one week of work at his pre-petition rate of compensation.[11] This is not persuasive to Zell's application, who was not retained pre-petition, had no set salary, and stretched his employment to nearly six years. Similarly, the Court in *Matter of All Seasons Industries Inc.* 121 B.R. 822, 825 (Bankr.N.D.Ind.1990), only held that a Debtor need not obtain court approval to retain existing management at same level of compensation as being paid prior to filing. *Id.* at 826. Other cases which Debtor's counsel cites also support this contention. *See In re Lyon & Reboli Inc.*, 24 B.R. 152, 154 (Bankr.E.D.N.Y.1982) (debtor may continue to compensate existing management at pre-petition rates without court approval); *In re Beco, Inc.*, 46 B.R. 563 (Bankr.W.D.La.1985) (president's post-petition salary while debtor continued operations was paid as administrative expense at pre-petition rate despite assumption of additional duties).[12]

These holdings are consistent with my view. Continuation of pre-petition employ-

---

**10.** "Conceptually, the costs of administration are a kind of priority afforded to those who either help preserve and administer the estate or who assist with the rehabilitation of the debtor so that all creditors will benefit." *Id.* at 1383.

**11.** Although the court did not rely on Section 327(b), it clearly authorizes the result in *Microwave*, as well as *All Seasons, Lyon & Reboli*, and *Beco, infra*.

**12.** The *Beco* Court also approved additional compensation to tile president for his services in a specific lawsuit which were "instrumental in the recovery of a large sum on behalf of *Beco*." The trustee never specifically obtained court approval of this "employment" but utilized tile president whose services were of great benefit to the estate. The court held that the objecting party had "failed to give the court a reasonable alternative by which the trustee ... could have obtained the services of Mr. Booker" and allowed an administrative expense award of $10,123.00. In doing so the court glossed over Booker's disqualification under 327(a) under an apparent belief that the necessity of his services in this discrete litigation warranted compensation. In light of tile fact that the opinion was result-oriented, not well-founded in the Code, and because the insider's compensation was apparently being championed by the trustee who utilized him, rather than, as here, by the insider himself, I find *Beco* to be entirely unpersuasive.

ment tends to support compensation under Section 327(b) or 503(b)(1); ordinarily, the applicant is a non-professional employee whose wage or salary claim accrues in the ordinary course, or a professional who may be retained under Section 327(b) but only if necessary in the operation of the business. In the present case, Debtor retained Mr. Zell post-petition in order to oversee a liquidation. The cases relied upon by Zell's counsel are unpersuasive. Because I find that Zell served in the capacity of a professional, a position for which he was disqualified under Section 327(a) and which was not authorized under Section 327(b), his compensation application may not be approved pursuant to Section 503(b)(1).

Finally, I must consider whether any "expenses" incurred by Mr. Zell are allowable under Section 503(b)(1)(A) despite the above conclusion that he cannot receive "compensation" under that section. I hold that he cannot. As a professional, his exclusive recourse for "compensation" *or* "expenses" is under Section 330, an avenue to which he is not entitled. Thus he can be awarded neither compensation nor expense reimbursement.

## IV. Mr. Zell's application prevents meaningful review of his services or expenses, thus barring any recovery.

 Even if Mr. Zell's application could be entertained by way of retroactive employment, or as a Section 503(b)(1) administrative expense, the Court is utterly without any foundation on which it can meaningfully review his fee application in light of the fact that no contemporaneous records were maintained. Zell reconstructed a narrative of his duties from memory and the records of the company. Although I entertain no doubt that it sets forth a reasonable summary of his activities, nevertheless, the magnitude of the time he spent working for the debtor corporation and the true value of those services is unknown and can never be known. He had no fixed periodic wage or salary which could form the basis for valuing his services. In the absence of a specific salary or wage, I know of no better method for fixing the value of services than the usual hourly compensation model. However, under such an analysis, the clear weight of authority is that an applicant for compensation bears the burden of proof, and that lack of time records forms a sufficient basis for disallowance of the application. *See In re Beverly Mfg. Corp.*, 841 F.2d at 365; *Matter of Concrete Products, Inc.*, Ch. 11 Case No. 89–40074, slip op. (Bankr.S.D.Ga., Feb. 7, 1992) (Davis, J.) (Trustee awarded compensation only for the employment hours which were substantiated by detailed time records); *Matter of First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.1977).[13] Because no time records were kept and the record is otherwise insufficient to quantify how much time he spent or the reasonable hourly value of his services, the application for compensation cannot be approved.[14]

 With respect to reimbursement of Mr. Zell's out-of-pocket expenses, the application is similarly deficient. Zell seeks reimbursement of expenses of a number of items for which he has attached an estimated value. The evidence revealed that these "expenses" simply were absorbed by a closely-held family corporation, I–95 Mall, Inc., onto whose premises he consolidated the debtor's

---

**13.** Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent on the federal courts of the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

**14.** Zell's contention that as a non-professional he was not required to keep time records is simply wrong. First, I have held that he was a professional within the meaning of the Code. Second, even if non-professionals may not be required to meet tile same record keeping requirements that professionals are, it is precisely because they usually have a specific wage or salary that no other records are necessary. Since Zell had no set salary there is no foundation on which to compensate him other than time records. To hold that a disinterested professional must keep time records or time denied compensation but that an insider with no set salary need not do so would indeed be bizarre.

record-keeping after its office at the Brunswick port was closed. Zell is not personally out-of-pocket for any of these "expenses." They are rent $2,350.00 (47 months at $25.00 per month); Postage $191.00 (47 months at $3.00 per month plus $50.00 for "various" mailings); Supplies $120.00 and Travel $394.90 (.275 per mile for one weekly trip to the Brunswick post office for 72 weeks). The objection to these expenses is based on the fact that Zell applied for reimbursement, yet acknowledges that he personally advanced none of these funds. He testified, however. that when reimbursed, he will in turn reimburse I–95 Mall, Inc., which, through his direction, has deferred collection of these sums. Putting aside the fact that Zell's application is misleading because it suggests that he personally is out-of-pocket for the amounts sought, I agree that he still may seek expense reimbursement for amounts he may ultimately owe I–95 Mall. However, none of these arrangements were evidenced in writing and none of the expense items were documented by contemporaneous, precise bookkeeping entries. There was no showing of how Zell arrived at the proposed reimbursement amounts. While the expenses are not individually significant in amount, in the aggregate they are substantial. No evidence was presented as to the Debtor's level of use of the computer, rental space, or telephone, as opposed to Zell personally, or I–95 Mall, Inc., at whose office the expenses accrued. No evidence was presented that the unknown level of use was reasonably valued at the amounts sought to be recovered.

At best these numbers are mere estimates. Bankruptcy Rule 2016 requires an entity seeking "reimbursement" of necessary expenses to "set forth a detailed statement of ... the expenses incurred." I find the application deficient in failing to establish the "actual" expense in sufficient detail or in precise amount. While most reported cases in this area have dealt with the question of "necessity" of expenses rather than the "actual" amount, it is clear that the application must document both or it may be disallowed. *See In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 584 (Bankr.D.Utah 1985) ("[t]he fee application should include a detailed list of expenses for which reimbursement is sought, including date, type, and amount. Expenses must be actual, not estimates .... undocumented expenses will not be allowed."); *In re Marsh,* 14 B.R. 615, 617 (Bankr.E.D.Va. 1981); *In re G.W.C. Financial & Insurance Services Inc.,* 8 B.R. 122 (Bankr.C.D.Cal. 1981); *In re Casull,* 139 B.R. 525 (Bankr. D.Colo.1992); *In re Automobile Warranty Corp.* 138 B.R. 72 (Bankr.D.Colo.1991); *In re Adventist Living Centers, Inc.,* 137 B.R. 701, 719 (Bankr.N.D.Ill.1991); *In re Old South Transp. Co., Inc.,* 134 B.R. 660 (Bankr. M.D.Ala.1991). The postage and supply items are the clearest examples, but all of the expense requests are similarly infirm. Mr. Zell has not permitted this Court to engage in a meaningful review of his expenses and therefore, has not met his burden of "strict scrutiny" for allowance of this level of priority claim by his closely held corporation.

As to copy charges, all of the foregoing is applicable. There is no precise count of copies made. Moreover. evidence at the hearing revealed that Zell seeks recovery of 20 cents per copy, not the actual cost. and it was stipulated that commercial copying rates would have been 3½ cents per page. Accordingly, because no exact count was kept, because Zell seeks to overcharge [15] the Debtor by a substantial amount, and because of the

---

15. The Court acknowledges that charges of 20 cents per page and higher routinely have been allowed attorneys and other professionals who serve estates and seek compensation under Section 330. Because those professionals cannot be insiders, and because of the recognition that copies are billed to non-bankruptcy clients at a price greater than cost, copy charges are routinely approved for professionals at rates even higher than these. Mr. Pipkin, for instance, could have made these copies, documented the exact num-

ber, and been reimbursed 20 cents or more. He did not make the copies, however. For whatever reason he and Zell apparently agreed that Zell would do so. But Zell was, and is, disqualified for compensation and expense reimbursement under standards applicable to professionals. Moreover, as an insider, he should not be compensated for any rate higher than the commercially available cost, regardless of his professional status.

rigorous scrutiny to be giver insider claims, this item is also disallowed.

### V. Mr. Zell's 503(b)(1)(A) claim is barred due to his failure to disclose it.

█ As an alternative holding, Mr. Zell contended at the hearing, contrary to his initial application, that he need not be appointed by the Court to serve. I have ruled that as a professional, his employment required court approval, and because he was disqualified, he cannot be compensated. If that holding is incorrect and he is deemed a non-professional, nevertheless his lack of complete disclosure to the Court bars any recovery. If his status is governed by the standards applicable to non-professionals, to be consistent, then all the reports filed since 1990 with the United States Trustee should have revealed the accrual of his compensation and these expenses.[16] The financial reports filed with the Office of the United States Trustee show no accruing liabilities for any of these items. An examination of the most recent United States Trustee's financial reports of Concrete Products, Inc., shows that accrued accounts payable of the Debtor have been reported as "0.00." The systematic failure of Zell, an insider, to reveal the accrual of any salary or expenses causes the reports to materially misrepresent the economic worth of this Debtor's estate. Debtor's counsel, Mr. Orange, was surprised to learn that Zell would make this application, and if he was, certainly no creditor nor the United States Trustee could have known more. Because of the concealment of these expenses, the understatement of the liabilities of the estate, and the strict scrutiny required of insider claims, I hold that Zell is judicially estopped from obtaining reimbursement under Section 503(b)(1)(A). *See* O.C.G.A § 24-4-24; *Calhoun v. Williamson,*

76 Ga.App. 91, 45 S.E.2d 87 (1947); *Davis v. Auerbach,* 78 Ga.App. 575, 51 S.E.2d 527 (1949); *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510 (3rd Cir.1953) (holding that a party may not assume inconsistent or mutually contradictory positions with respect to the same matter in the same or successive suits); *In re Oneida Motor Freight, Inc.,* 848 F.2d 414 (3rd Cir.1988) (holding that debtor's failure to disclose claims against creditors in bankruptcy proceeding judicial estopped him from later prosecuting claims); *see also Deloach v. Provident Health Services, Inc.,* Case No. CV493-120, slip op. at 6-8 (S.D.Ga., Sept. 1, 1993) (Alaimo, J.) (holding that judicial estoppel does not preclude a Chapter 7 trustee from bringing a suit which the debtor failed to list on her schedules).[17]

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Debtor's Motion to Employ Insider Harold Zell *Nunc Pro Tunc* and Motion to Compensate and Reimburse Harold Zell is denied and his claims are disallowed.

---

**16.** The latest periodic reports reveal Zell as an officer or owner on attachment "7," but contain an entry that shows zero compensation paid. The accounts payable report, attachment "2," shows no accrual to Zell for salary or expenses and he is not listed as a priority or unsecured creditor on the attached schedules.

**17.** Although the *Deloach* Court declined to invoke judicial estoppel, in this case similar reasoning warrants the doctrine's application. For

example, this applicant has not been replaced by a trustee and, instead, is the same individual now assuming an inconsistent position. Moreover, considering the benefit to creditors estoppel requires that this applicant be denied a priority position above those who were deprived of any ability to monitor these expenses over the past five-plus years.